## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ )<br>**ELIZABETH LEONARD and,** )<br>**TIMOTHY J. LEONARD,** )<br>       **Plaintiffs,** )<br>  )<br>    **v.** )<br>  )<br>  **)**<br>  )<br>**GENERAL ELECTRIC COMPANY,** )<br>       **Defendant.** )<br>  )<br>_____ ) | **CIVIL ACTION**<br>**NO. 14-40107-TSH** |

## <u>MEMORANDUM OF DECISION AND ORDER</u>
### July 28, 2016

**HILLMAN, D.J.**

### <u>Introduction</u>

Elizabeth Leonard ("Elizabeth") and Kent Leonard  ("Kent" and together with Elizabeth "Plaintiffs") have filed an action against  General Electric Company ("GE") demanding payment of death benefits allegedly owed them pursuant to a GE employee accidental death benefit insurance policy as a result of the death of their father, James Leonard ("James").  The policy is a regulated employee benefit welfare plan under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA").

James died on June 27, 2008.  Metropolitan Life Insurance Company ("MetLife") is the issuer of the "GE Life, Disability and Medical Plan" (the "Life Insurance Plan") and the optional "GE Personal Accident Insurance Plan for Accidental Death or Dismemberment" (the "Accident Insurance Plan" and, together with the Life Insurance Plan, "Plans") which James obtained

through GE and under which he was covered at the time of his death.  MetLife has paid the

Plaintiffs basic death benefits of $308,479 under the Life Insurance Plan. Plaintiffs seek an

additional $280,435 of benefits under the Accident Insurance Plan.  This Memorandum of

Decision and Order addresses *Pls' Mot. For J. On the Administrative Record and Mem. Of L. In

Supp. Thereof* (Docket No. 27) and *Def's Mot. For J. on the Administrative Record* (Docket No.

35).  For the reasons set forth below, Defendant's motion is *allowed* and   Plaintiffs' motion is

*denied*.

## Facts

### Relevant Plan Provisions

James, an employee of GE, was a participant in both the Life Insurance Plan and the

optional Accident Insurance Plan.[1] The Life Insurance Plan provides that it "will pay benefits for

bodily injury … caused solely by accidental means and, independently of all other causes,

resulting in death or loss of hand, foot, or sight of eye." The Accident Insurance Plan provides

that "[b]enefits will be paid for bodily injury … caused solely by accidental means and,

independently of all other causes, resulting in death or loss of hand, foot, or sight of eye."  The

Life Insurance Plan and Accident Insurance Plan further provide that "no benefits will be

payable if the death or loss is caused or contributed to by disease, or bodily or mental infirmity

or medical or surgical treatment of such disease or infirmity …"

The Accident Insurance Plan further provides that "[b]enefits are payable upon

[submission of] proof of claim" and that such "[p]roof of claim must be filed not later than 180

days after the loss for which claim is made is incurred unless it is not reasonably possible to do

so and proof is filed as soon as is reasonably possible." The Life Insurance Plan provides that

---

[1] The Life Insurance Plan, which provided for basic coverage, was funded by GE. The Accidental
Insurance Plan provides additional coverage which eligible employees could elect to purchase.

"[p]roof of claim must be filed not later than 180 days after the end of the calendar year in which the loss for which claim is made is incurred unless it is not reasonably possible to do so and proof is filed as soon as is reasonably possible."

### *James's Medical Conditions*

James, who was born in 1958, first began drinking alcohol at age 15 or 16.  During his early twenties, his alcohol "use escalated and began to become a problem." In the late 1990s, he had "an episode of ascites" (*i.e.*, an accumulation of fluid in the abdominal cavity, which is a common problem for individuals who have cirrhosis[2]).  James was "hospitalized with abnormal liver functions, told he had fluid in his abdomen and was tapped" *i.e.*, the fluid in his abdomen was drained. After this, James remained sober for about seven years (from 1998-2005). In February 2006, James reported that he was drinking "a fifth of [a gallon of] Alcohol" a day. At this time, he was not interested in an "alcohol detox." In August 2007, James was admitted to the hospital "with a chief complaint of 'drinking.'" He reported that he had "been drinking for 2 years heavily and daily for a year." In January 2008, it was reported that James had a history of "abnormal LFTs [liver function tests] as well as alcoholic liver disease," hypertension and dyslipidemia (high cholesterol).

In early April 2008, James was taken to the emergency room with a blood alcohol content ("BAC") of .341. He reported that he was drinking copious amounts of vodka almost every evening." In early April 2008, James reported he had been drinking approximately a quart of alcohol (whiskey) daily for the prior 30 days. It was noted that he had a history of "alcoholic

---

[2] Cirrhosis is a condition in which the liver slowly deteriorates and is unable to function normally due to chronic, or long lasting injury.  Scar tissue replaces healthy liver tissue which blocks the flow of blood through the liver and slows the processing of such things as nutrients, drugs, naturally and naturally produced toxins and the production of substances made by the liver. WebMD: *//www.webmd.com/digestive-disorders/cirrhosis-liver.*

liver disease" and that his liver was "down about 3-4 cm" (a symptom of cirrhosis).  Thereafter,
James decided to get sober.

*James's Death*

On June 1, 2008, James was brought to the emergency room with complaints of
alcohol withdrawal and 24 hours of abdominal pain.  He reported having "been on a bender for
several days."  He could not "recall any definite trauma." More specifically, he "did not recall
having fallen or … any trauma to the abdomen" However, some medical records suggest that he
may have fallen out of bed or sustained some other trauma which he could not remember due to
alcohol intoxication.  Upon admission, James was found to have an injury to his spleen (a splenic
rupture/laceration). He was deemed not be a good "surgical candidate because of [his] severe
underlying liver disease and the terrible condition he was in."  Therefore, a non-surgical
procedure was performed which stopped the bleeding. After initial improvement, James went
into "flagrant alcohol withdrawal syndrome."  His liver function tests were markedly abnormal.
On June 6, 2008, James was found unresponsive.  On June 9, 2008, the examining physician
noted as follow regarding his impression and treatment plan:

> 1. Alcoholic liver disease – presumed hepatitis and cirrhosis. Mr. Leonard
> has [a] longstanding history of chronic alcohol use. He has a history of
> previous GI bleeding. His present problem has apparently occurred as a
> result of an alcoholic bender where he fell and sustained an injury/
> laceration to his spleen which has been treated satisfactorily with
> interventional radiology. His liver functions tests have been relatively
> stable or slowly improving. At the moment, his elevated liver tests appear
> to be on the basis of alcoholic hepatitis, cirrhosis. It is unclear whether he
> could have taken some other toxic substance or whether he has had a past
> history of viral hepatitis. For the moment, I have suggested that he have
> serial LFTs. He does not appear to be a candidate for any other studies
> such as liver biopsy.
>
> 2 Ascites. He has ascites secondary to his alcoholism problem and this
> might be treated with low-dose Aldactone and/or Lasix as his course
> proceeds.

3. Alcohol withdrawal syndrome – the patient presently [is] in an active phase of alcohol withdrawal syndrome. He has been treated supportively and symptomatically and we will continue with thiamine.

4. Anemia – secondary to splenic laceration. For the moment, this problem appears to be relatively stable.

According to the doctor, James's prognosis was poor.  Thereafter, James's condition worsened and he died on June 27, 2008.

On July 1, 2008, Dr. Stephen Wolanske signed a "Medical Examiner's Certificate of Death" ("Death Certificate"), stating that "[o]n the basis of examination and/or investigation in my opinion death occurred at the time, date, and place and due to the cause(s) stated" in the Death Certificate. The Death Certificate has a section captioned " 29 Part I – Cause Of Death – Sequentially List Immediate Cause Then Antecedent Causes Then Underlying Causes." In "29 Part I" of the Death Certificate, the "Immediate Cause" of James's death was reported by the medical examiner to be "hepatorenal failure due to cirrhosis due to alcohol abuse."  No other cause is listed in "29 Part I" of the Death Certificate. In section "30 Part II," hypertension and splenic rupture are listed as "*other* significant conditions *contributing* to death." (emphasis added). The medical examiner also reported that the "manner of death" was "natural" (as opposed to accident, homicide, suicide, "could not be determined," or "pending investigation").

### *Plaintiffs' Benefits Claims*

 The "loss" under the Plans, (*i.e.,* James's death), occurred on June 27, 2008. Accordingly, proof of claim under the Accident Insurance Plan was required to be filed by on or about December 27, 2008 and proof of claim under the Life Insurance Plan by the end of June 2009. The Plaintiffs, as designated beneficiaries, each submitted claim forms on July 8, 2008. The claim forms did not specify the nature of the death benefits for which they were applying, but were directed to "GE Group Life Claims."  Moreover, the second page of the claim form

included the heading "Life Insurance Beneficiary Claim Form (cont'd)."  At the time of his death

James was insured pursuant to the Life Insurance Plan for aggregate benefits of $308,479 and

under the Accident Insurance Plan for benefits of $280,435.  On July 29, 2008, MetLife paid

Plaintiffs the death benefits due them under and in accordance with the Life Insurance Plan.  In

paying the claim, MetLife did not reference the existence or applicability of the Accidental

Insurance Plan.

In late November 2009, almost eighteen months after James's death, Dr. Harvey

Clermont wrote a letter to Plaintiffs' counsel concerning his recent review of James's medical

records. Dr. Clermont asserted that James's death was "causally related to [an] accidental fall

which resulted in a traumatic rupture of his spleen" and that because "he was not a surgical

candidate, this set up a progressive series of systems failure that ultimately resulted in his death."

Inexplicably, Plaintiffs did not submit Dr. Clermont's November 2009 letter to GE or MetLife,

the benefits administrator for the Plans, until March 2014 – more than four years after it was

received and almost five years after James's death. Dr. Clermont's report was first submitted to

GE on March 2014.  At that time, Plaintiffs' counsel advised GE that: "**CLAIM IS HEREBY**

**MADE FOR PAYMENT OF THE ACCIDENTAL DEATH BENEFIT PROVIDED BY**

**THE [REFERENCED GE] PLANS AND BY ANY OTHER PLANS IN WHICH**

**DECEDENT WAS ENROLLED AT DEATH.**" (emphasis in original).

In June 2014, Plaintiffs commenced this action. In September 2014, the Court stayed the

case so that Plaintiffs could exhaust their administrative remedies under the Accident Insurance

Plan. As part of the administrative process, Dr. Derrick Bailey reviewed the matter. Dr. Bailey

noted that the Death Certificate indicated that James's "death was primarily from hepatorenal

syndrome (kidney failure that is [a] complication of cirrhosis), cirrhosis and alcohol abuse." Dr.

Bailey opined that the record did not support that James's "death was from the splenic laceration

primarily" and that the information in the record demonstrated that James's "alcohol abuse

and cirrhosis contributed to the loss." Dr. Bailey noted that "[l]iver disease can lead to increased

risk of bleeding from injuries because of abnormality of a number of clotting factors and altered

platelet function among others."

In May 2015, MetLife, informed Plaintiffs that it was denying their claim for accidental

death benefits under the Accident Insurance Plan because: (a) there was insufficient proof that

James's splenic injury was caused by an accidental fall, as claimed by Plaintiffs; (b) even if

James's splenic injury was caused by an accidental fall, the record did not support that the

splenic injury was the sole and independent cause of his death; (c) James's alcoholic liver

disease caused or contributed to cause his death; and/or (d) proof of claim for accidental death

benefits was not submitted in a timely manner. In July 2015, Plaintiffs filed an administrative

appeal of MetLife's determination; no additional records were submitted with the appeal.

Thereafter, Dr. Bruce Goldman, Director of Autopsy Pathology for the University of Rochester

Medical Center, reviewed the matter. Dr. Goldman did not necessarily agree with the medical

examiner that the cause of death was natural, instead he opined that it was "undetermined." Dr.

Goldman reached this conclusion based on the fact that although James suffered from chronic

liver failure and alcoholism, it is unlikely he would have died without the complication of the

splenic laceration.  However, he could not determine from the record whether James's splenic

injury was spontaneous or from a fall—if it were from a fall, he would characterize the death as

accidental, however, if the splenic laceration occurred spontaneously, he would characterize the

death as natural. Dr. Goldman agreed with the medical examiner's determination that the "underlying cause of death was hepatic cirrhosis most likely due to alcohol abuse." Dr. Goldman concluded by stating that James died "because of multiorgan injury caused or exacerbated by chronic liver disease. The effects of splenic rupture appear to have been effectively treated by splenic artery embolization and blood transfusion during [James's] last hospitalization, evidenced by improvement in clinical parameters until around 6/10/2008, when peripheral WBC count began to rise again. An individual without chronic liver disease would not have been expected to expire in the absence of such liver disease."

In August 2015, MetLife upheld the denial of Plaintiffs' claim for accidental death benefits.  MetLife determined that accidental death benefits were not payable to Plaintiffs because: (a) there was insufficient proof that James's splenic injury was caused by an accidental fall; (b) even if James's splenic injury was caused by an accidental fall, the record did not support that the splenic injury was the sole and independent cause of his death; (c) at the very least, James's alcoholic liver disease contributed to cause his death, which precluded recovery of accidental death benefits under the express terms of the Accident Insurance Plan; and/or (d) the claimed "proof" in support of Plaintiffs' claim for accidental death benefits (*i.e.*, Dr. Clermont's November 2009 report) was not provided to GE or MetLife in a timely manner.

## Standard of Review

The parties have filed cross-motions for judgment on the administrative record. The Court reviews the acts of the ERISA plan administrator de novo unless the benefit plan gives the administrator discretionary authority to construe the terms of the plan or determine eligibility for benefits. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948 (1989). There is no dispute that the Accident Insurance Plan gives MetLife discretion to interpret its

terms and therefore, MetLife's decision is reviewed under the abuse of discretion standard.

Accordingly, MetLife's denial of Plaintiffs' claims will be upheld unless it is arbitrary,

capricious, or an abuse of discretion, that is, it will be upheld if there is any reasonable basis for

the decision. "Stated in different terms, [the court] will uphold an administrator's decision 'if the

decision was reasoned and supported by substantial evidence,' meaning that the evidence 'is

reasonably sufficient to support a conclusion and contrary evidence does not make the decision

unreasonable.'" *Morales-Alejandro v. Med. Card Sys., Inc.*, 486 F.3d 693, 698 (1st Cir. 2007).

Moreover, where the administrator and a rejected claimant offer rational, albeit conflicting,

interpretations of plan provisions, the administrator's interpretation must stand.  However, where

the administrator of a plan imposes a standard not required by the plan's provisions, interprets

the plan in a way that is inconsistent with the plan's plain language, or interprets the plan in a

way that renders some provision(s) of the plan superfluous, the plan administrator's actions may

be found to be arbitrary and capricious. *Joyce v. John Hancock Financial Servs., Inc.,* 462

F.Supp.2d 192, 205 (D.Mass. 2006).

## Discussion

Plaintiffs take the position that their claims filed in July 2008 should be read as including

an application for benefits under the Accident Insurance Plan and therefore, their claims for

accidental death benefits were timely. The Plaintiffs further assert that MetLife's denial of their

claims for accidental death benefits was an abuse of discretion because the substantial evidence

in the record supports a finding that James's splenic injury was caused by an accidental fall, and

that the splenic injury was the sole and independent cause of his death.    This is not a close case

and there are multiple reasons for denying Plaintiffs' claims for accidental death benefits.

_Whether the Plaintiffs' Claim for Accidental Death Benefits was Timely Filed_

The Accident Insurance Plan provides that claims shall be filed within 180 days of the date of the loss, _i.e.,_ the date of death.  Therefore, Plaintiffs' proofs of claim under the Accident Insurance Policy had to be filed by on or about December 27, 2008**.**  Plaintiffs asserts that the proofs of claim they each filed in July 2008 covered both their claim for benefits under the Life Insurance Plan and the Accident Insurance Plan and therefore, were timely.

The front page of each of the proofs of claim filed by the Plaintiffs contains a generic heading referencing only that it is a "Beneficiary Claim Form," while the second page of the forms states that it is a "Life Insurance Beneficiary Claim Form." Given the ambiguousness of the form, there is some traction for Plaintiffs' position.  However, the Death Certificate which Plaintiffs included with their proofs of claim clearly stated that James died of hepatorenal failure due to cirrhosis due to alcohol abuse; hypertension and splenic rupture are listed as "_other_ significant conditions _contributing_ to death." (emphasis added). The medical examiner also reported that the "manner of death" was "natural."  Nothing in the claim forms submitted by the Plaintiffs remotely suggests that they were pursuing a claim for accidental death benefits. Further, when MetLife only paid the Plaintiffs the amount owed under the Life Insurance Plan, Plaintiffs did not file an appeal with MetLife contending that they were wrongfully denied benefits under the Accident Insurance Plan.  Moreover, there is nothing in the record to suggest that the Plaintiffs thereafter contacted MetLife to inquire as to the status of a claim under the Accident Insurance Plan.

On or about March 19, 2014, Plaintiffs' counsel sent a letter to MetLife stating that the Plaintiffs were _filing_ a claim for benefits under the Accident Insurance Plan; MetLife was asked to forward the appropriate claim forms.  There is no suggestion made in the letter that Plaintiffs

had previously filed such a claim that MetLife had either implicitly denied, or failed to process. On this record, Plaintiffs attempt to re-characterize the proofs of claim filed in July 2008 as including a claim for accidental death benefits under the Accident Insurance Plan is unsupported by the record evidence.  The question now becomes whether the Plaintiffs' filing of their proofs of claim over five years after they were required to be submitted to MetLife bars recovery of the accidental death benefits.

The express terms of the policy provided that Plaintiffs were required to file their accidental death benefits claims by on or about December 27, 2008.  Even if I assume that at that time, they were not aware, and reasonably should not have discovered, that their father may have died an accidental death (and therefore, that it was not reasonably possible for them to file their proofs of claim by on or about December 27, 2008), their claims were untimely.  Under the terms of the Accident Insurance Plan, where it is not possible to file the claim within 180 days of the date of loss, then it must be filed "as soon as is reasonably possible."  Plaintiffs' attorneys received the report from Dr. Clermont stating that it was his professional opinion that James's death was the result of an accidental fall *at the end of November 2009*.[3]  Thereafter, Plaintiffs only had such reasonable time as necessary to give them a fair opportunity to file their proofs of claim. At most, it would seem that a reasonable time would be 180 days after the date that Dr. Clermont's letter was received by counsel*, i.e.*, the amount of time within which a proof of claim must be filed under the Accident Insurance Plan after the "loss" is incurred.

Inexplicably, Plaintiffs waited until March 19, 2014 to file a claim for accidental death benefits. They contend that the proofs of claim they filed in July 2008 should be construed to

---

[3] While it is not clear from the record, Plaintiffs presumably engaged Dr. Clermont for purposes of determining their father's cause of death, that is, to determine whether his death was attributable to natural causes or some other cause, such as an accident.

include the accidental death benefits simply because MetLife provided the proof of claim form.

However, they have not cited to any legal authority in support of this proposition. Moreover,

they provide no legal argument to support their contention that MetLife should be estopped from

asserting that the accidental death benefit claim was untimely.  For that reason, I find the defense

waived.  I also note that Plaintiffs do not argue that MetLife must establish that it was

prejudiced by the late filing.  Any such argument would likely be unavailing:  while the First

Circuit does not appear to have addressed the issue, courts in this district have found that the

Massachusetts notice/prejudice rule set forth in Mass.Gen.L. ch. 175, §112 does not apply in the

ERISA context.  That is, the plan administrator can refuse to address an untimely claim without

fist establishing that is was actually prejudiced by the late filing.  *See Teteault v. Reliance

Standard Life Ins. Co.*, Civ. Act. No. 10-11420-JLT, 2011 WL 7099961 (D.Mass. Nov. 28,

2011); *Monast v. Johnson & Johnson*, 680 F.Supp.2d 299, 305 (D.Mass. 2010).

Plaintiffs filed their claim for accidental death benefits on March 19, 2014— more than

five years after the date of loss, and more than four years after receiving Dr. Clermont's report.

Under the circumstances, I do not find that MetLife abused its discretion in denying Plaintiffs'

claims as untimely.

<u>*Whether James's Death Was Accidental*</u>

Even had Plaintiffs filed timely proofs of claim, recovery would be barred.  It is

axiomatic that "death from a disease is not is not an 'accidental' death".  *Phan v. Metropolitan

Life Ins. Co.*, Civ. Act. No. 12-11490-DPW, 2014 WL 595763, at *5 (D.Mass. 2014).  "If an

accident was not the 'sole cause' of [decedent's] death or if his death results 'in any way' or was

contributed to by disease," then decedent's beneficiaries are not entitled to recover accidental

death benefits.  *Id.* Moreover, where the policy provides, as it does in this case, that recovery is

12

proper only if the death was "caused solely by accidental means and, independently of all other

causes, the plaintiff must prove that a medical condition caused by say a fall or other accident

was the direct cause of [decedent's] death independent of any preceding medical condition; that

is, that the [accident], as opposed to the [preceding medical condition], was the dominant cause

of … death." *Id.* (internal quotations omitted; quoting *Gay v. Stonebridge,* 660 F.3d 58, 60 (1st

Cir. 2011)).   Where the a sickness or disease causes an event which results in death, the death is

generally considered to be the result of an accident--for example, an individual has an epileptic

seizure that causes a fall resulting in a fatal head injury.   However, if the accident causes a fatal

episode of the disease, the death is "caused or contributed to" by disease, *i.e.*, the accident is not

the "sole cause" of death. *Id.*, **6-7.   Where the evidence establishes "that more than one factor

contributed to [decedent's] death … [plaintiff] bears the burden of separating out the

consequential causes from the inconsequential causes of … death." *Id.* (internal quotations

omitted; citing *Gay*, 660 F3d at 60.

A protracted discussion is not warranted.   Plaintiffs' primary evidence in support of their

contention that their father died an accidental death is Dr. Clermont's letter.   First, the evidence in

the record is *at best* equivocal as to whether James injured his spleen in a fall.   The medical

records show that James did not remember falling.   Both Dr. Goldman and Dr. Clermont

indicated that splenic injuries can be caused not only by trauma, but also spontaneously as the

result of an underlying disease[4].   Even assuming that James did suffer abdominal trauma

attributable to an accidental fall, there is substantial evidence in the record to support

Metropolitan's finding that any injury caused by a fall *was not* the sole and independent cause of

---

[4] While recognizing the possibility, Dr. Clermont stated that the injury to James's spleen was not the result of a spontaneous rupture, but instead was directly related to a fall.

death.[5] James suffered from cirrhosis of the liver and hypertension.  Additionally, he was in the throngs of acute alcohol withdrawal (after being on a multi-day "bender") when brought to the emergency room. The *overwhelming* evidence in the administrative record establishes that James's chronic liver disease, if not the sole cause, at least contributed to his death. Furthermore, while Dr. Clermont, concludes that James's death was "directly and causally related to the accidental fall which resulted in traumatic rupture of his spleen," Dr. Clermont does not state that such traumatic injury was the sole and independent cause of death, *i.e.,* he does not opine that James's underlying liver disease did not contribute to the death. On the contrary, read as a whole, Dr. Clermont's letter does not contradict the findings of the other medical professionals relied on by MetLife to support its finding that Plaintiffs are not entitled to accidental death benefits because an accidental injury was not the sole and independent cause of James's death.

For the reasons set forth above, I find that MetLife did not abuse its discretion in denying Plaintiffs' claims for accidental death benefits.  Accordingly, judgment shall enter for MetLife.

## Conclusion

1. Plaintiffs' Mot. For J. On the Administrative Record and Mem. Of L. In Supp. Thereof (Docket No. 27) is ***denied***; and

2. The Defendant's Mot. For J. on the Administrative Record (Docket No. 35) is ***allowed***.

/s/ *Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**

---

[5] While it is not necessary to address the issue, I will note that MetLife is correct that assuming that James did suffer a splenic injury in a fall, the fall almost certainly occurred during a period he was drinking heavily—indeed, he was drinking so heavily he could not remember what occurred ruing the days preceding his trip to the emergency room (at the time that James came to the emergency room, his BAC was still slightly above the legal limit for driving.) Where the injury was caused or contributed to by alcohol intoxication, in general, courts in this Circuit will not find that the administrator abused its discretion by denying accidental death benefits.  *See Stamp v. Metropolitan Life Ins. Co.*, 551 F.3d 84 (1st Cir.  2008)(alcohol-related deaths are not per se non-accidental (or accidental), rather where alcohol intoxication is a substantial contributing cause leading to the injury, administrator's determination that death was not result of accident would not be overturned).